### JOHNSON v. JOHNSON.

(Circuit Court, D. New Jersey. September 11, 1911.)

1. PATENTS (§ 240*)—INFRINGEMENT—IMPROVEMENT PATENTS.

Where a patent sued on and one alleged to infringe are not pioneer patents and do not embody a primary invention, but are both only for improvements on the prior art, and defendant's machine can be differentiated, the charge of infringement cannot be maintained.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 379; Dec. Dig. § 240.*]

2. PATENTS (§ 328*)—INFRINGEMENT—TENNIS COURT MARKER.

The Johnson patent, No. 850,936, for an improvement in tennis court markers, is an improvement patent only, and, if conceded invention over prior structures, must be narrowly construed, and is not infringed by the machine of the Johnson patent, No. 929,597.

In Equity. Suit by William A. Johnson against Adolph Johnson for infringement of letters patent No. 850,936, granted April 23, 1907, to complainant, for improvement in tennis court markers. On final hearing. Decree for defendant.

E. W. Marshall, for complainant.

Ewing & Ewing (George H. Gilman, of counsel), for defendant.

RELLSTAB, District Judge. The complainant is the patentee. In his application for such letters patent he declares the object of his invention "is to provide a simple and efficient apparatus for marking lines upon a surface, such as a tennis court, football field, etc." Claims 2, 4, and 6 alone are involved in this suit. They are as follows:

"2. A receptacle, a running-gear therefor, a brush and a flexible connection between the receptacle and the brush."

"4. A wheeled receptacle adapted to be moved across a surface, an outlet pipe, a brush associated with said pipe, the brush being arranged to bear upon said surface, and means for producing a constant pressure of said brush upon the surface."

"6. A wheeled receptacle, a handle therefor, an outlet valve connected with said receptacle, a brush, a hollow flexible connection between the valve and the brush, and means for operating said valve from the handle."

The alleged infringing machine is made under letters patent No. 929,597, issued to defendant July 27, 1909. The applications for both these patents encountered opposition in the Patent Office. The claims of complainant corresponding to those in suit, with

others, were rejected on Jakob, No. 776,329, November 29, 1904. Subsequently claims 2 and 6, without amendment, and claim 4, after inserting "constant" before "pressure," were allowed. Defendant's claims were rejected on complainant's patent, but after reconsideration were allowed without amendment.

The defenses are the usual ones of invalidity and noninfringement. A number of patents were set up as anticipations. Only two, however, were discussed and relied upon at the argument: British patent No. 14,837, granted to Frank S. Mitchell in 1892; and the Jakob patent, already mentioned. These four devices all employ a tank to hold the marking fluid, mounted on a wheeled carriage easily moved over the surface to be marked; an outlet pipe attached to this tank, which leads to the marking element; and valves in the outlet pipe to control the passage of the fluid. The alleged invention in each of these devices subsequent to Mitchell's is confined to the marking element and the means of carrying the fluid to it from the tank or receptacle.

The prior art showed that the marking was done either by scattering a dry material onto the ground, or, when liquid was used, prior to the advent of the Mitchell patent, impressing it on the ground by rolling a wet tape or wheel rim over it. The Mitchell device—the pioneer, so far as disclosed by the record—introduced the use of a circular or flat brush as the marking element. The marking fluid passed from the tank into the brush through an outlet tap, and on and into the ground to be marked by bringing the extremities of such brush into contact with such surface, and keeping it in regular contact therewith, by the assistance of a spring so placed as to bear downwards upon the stock of such brush. Mitchell, in setting forth the prior art, stated:

"Hitherto in such markers it has been generally customary to lay down the marking liquid by means of a traveling band or revolving wheel."

And in stating his invention, its purpose, and the method of operation, he said:

"This invention consists essentially in constructing the marker with a revolving or other brush which will force the marking liquid well into the ground over which it travels, the brush being held in contact with the ground by a spring or weight. * * * The marking liquid is applied to the periphery of the brush as it rotates by the tap $G$, this tap is provided with a lever $g$ attached or connected to the chain or cord $E$ so that when the brush is raised out of contact with the ground the tap is at the same time shut off and the flow of the liquid stopped."

Referring to his flat brush, he said:

"Instead of a circular rotary brush, a flat brush $H$ may be used, to which the marking liquid is supplied from a tap in the tank or container as before preferably through the center of the brush by it being made hollow. The brush $H$ can be formed as part of the tap $G'$, as shown; the raising of the brush serving to close the tap. The brush $H$ is held against the ground with the desired pressure by the spring $F$ and may be lifted by the chain $E$. The action of the brush in applying the marking liquid is to force it in amongst the roots of the grass or the pores of wood, stone, or other material forming a floor, and so render the marking more durable than when merely laid lightly upon the surface, as is usually the case."

The idea of forcing the liquid well into the ground is also expressed in his first claim, and the means used were well adapted to carry out such idea.

The Jakob device was patented 11 years later, and, judging by the language employed in stating the changes contemplated by such device, seemingly in ignorance of the British patent, employs an elbow discharge pipe to conduct the liquid from the tank to the brush. The patentee ·in this connection said:

"This elbow pipe is provided with a suitable globe valve *14*, and upon the lower end of said pipe is secured an adjustable telescopic section of pipe *15*, which is held in its adjusted position by screws *16 16*, carried by said pipe *12*. * * * An angular brace *19'* is employed to steady and support the pipe *12*, said brace being connected to the base of the tank and to pipe *12*. * * * The pipe *15* (telescopic) is adapted to be adjusted, whereby the ᾿brush will have a sufficient bearing upon the ground to thoroughly apply the marking material thereon, and this marking material is adapted to percolate through the block *19* into the flexible parts of the brush, from where it flows to the ground and is thoroughly applied by said brush."

The record shows that the Jakob machine was used in the marking of lawn tennis courts, and that it worked satisfactorily.

The Mitchell brush, as noted, is held in close contact with the surface by the aid of a spring, while that of Jakob by a telescopic pipe which, though adjustable, is held tight by screws when the marking it to be done. The only flexibility, therefore, in the marking element of either of these devices, consists in such flexing as takes place as the brush contacts with the surface.

This was the state of the art when the complainant patented his device. He was chargeable with knowledge of all that was taught and recognized by the Mitchell and Jakob patents. His claims are to be read in the light of his disclosures in the specifications, and tested and construed by the state of the art. Complainant's device has a valve connecting the outlet pipe with a flexible tube through which the marking fluid is conveyed to a brush. This brush is so mounted that, when the device is in use, it bears on and trails along the surface to be marked, and may be pressed against such surface by means of a supporting arm under spring tension. The patent in this behalf states:

"In the bottom of the tank is an outlet *20*, to which a valve *21* is connected. A flexible tube *22* is connected to the opposite side of this valve. *23* is a lever connected to operate the valve *21*. This valve-lever is connected with an operating-rod *24*, which is carried up to a point near the handle *18*, where it may be bent, as shown at *25*, to facilitate its manipulation. A fixed stop *26* is provided on the frame *11*, in the path of movement of the valve-lever *23*, to limit the movement of the latter lever when it has been pushed over to close the valve *21*. An adjustable stop-piece *27* is shown on the other side of valve-lever *23*, which is arranged to limit the movement of the lever when it has been pulled over to open the valve *21*. Screws *28*, extending through a slot in the stop-piece *27* and into the frame *11*, are provided for the purpose of setting the stop-piece, and thus adjusting the amount of the maximum opening of the valve *21* to a pre-determined degree. *30* designates a bracket, which is attached to the lower part of the frame *11*, and to which a supporting arm *32* is pivoted at *31*. To the under side of one end of the supporting arm *32* an ordinary flat paint brush *33* may be clamped by means of a screw *34*. The flexible outlet tube *22* is led to a point near this end of the support-

ing arm and may be attached thereto. A designates a surface upon which this apparatus is to be used. It may be seen that the brush 33 is arranged to rest upon and to be drawn over this surface. It may be arranged to do this by its own weight. I prefer, however, to provide an arrangement which I will now describe for increasing the pressure of the brush 33 upon the surface A. A tension-spring 36 may be connected to the supporting arm 32 at the opposite end from that to which the brush is attached. A regulating screw 37 in the arm 32 may be provided to limit the upward movement of this end of the supporting arm, and a lock-nut 38 may be used in conjunction with this screw to hold it in place after it has been set in the desired position. 39 designates a guide which I sometimes use to prevent any lateral movement of the supporting arm 32 and the brush 33.

"The operation of this apparatus is obvious. A suitable marking fluid is placed in the tank or receptacle 10. The surface to be marked off may be laid out with strings to act as guides, and the apparatus may be pushed along with its forward wheel following these guide-lines. The valve 21 may be opened by a movement of operating-rod 24, when the marking fluid will pass down through flexible tube 22 to the brush 33, which will spread it upon the surface as desired. The lower part 35 of the end of supporting-arm 32 which holds the brush may be suitably grooved to feed the marking fluid evenly to the brush. The brush may be of any desired width. The marks, which I have, according to common practice, called 'lines,' for laying off a lawn tennis court, are two inches in width. A wider or a narrower brush may be used for wider or narrower lines. * * * While means are provided for causing the brush 33 to bear upon the surface to be marked, the flexible outlet pipe 22 and the spring 36 are so arranged that the brush will be raised by any lumps or projections and will not gouge into a surface such as an athletic field. Another of the many advantages of this device is the ease with which the brush may be removed, to be cleansed or to be replaced by another brush. The operator may at will vary the flow of the marking fluid to the brush, and may, of course, shut it off entirely. A hook 40 may be provided to hold the brush off from the ground when the apparatus is not in use, or is being moved about over surfaces which are not to be marked."

Generally stated, Mitchell's device differs from the two patents mentioned in two particulars: First, while the brush of the earlier patents contacts the ground rigidly at right angles thereto, that of complainant's touches the surface slantingly—an oblique angle; and, second, that it trails along the surface as the carriage moves over the ground, rising and falling and adapting itself to such irregularities as are ordinarily found in the surface of the ground. This dissimilarity in structure is not accidental, but purposely to effect such flexibility in complainant's marking element.

Complainant says that the essence of his invention is the embodiment of the principle of "floating" the marking fluid onto the surface over a marking element, as distinguished from "brushing out" or scrubbing such fluid into the ground to be marked, and that the patent discloses the apparatus for doing that. Complainant concedes that the prior art shows devices for "brushing out" or scrubbing, but contends that this was unsatisfactory, as employing the wrong principle, and that floating solved the problem, and that he was the first to discover that it would. The patent in suit does not say anything about floating, nor anything to indicate that the problem intended to be solved was the floating or running on of the liquid, as against the brushing it on or into the ground. His description shows that the fluid passes into a brush which was to contact the surface to be marked. The patent in this behalf states:

"It may be seen that the brush 33 is arranged to rest upon and to be drawn over this surface. It may be arranged to do this by its own weight. I prefer, however, to provide an arrangement * * * for increasing the pressure of the brush 33 upon the surface A."

And on referring to the action of the fluid it states:

"The marking fluid will pass down through flexible tube 22 to the brush 33, which will spread it upon the surface as desired."

And claim 4, consistent with this idea, points out that the brush is to bear upon such surface, and to be kept in contact therewith by constant pressure. In referring to the advantage of his device, patentee makes no reference in his patent to the benefit of floating the material on, as against the "brushing out" over or scrubbing into, the ground, but contents himself in pointing to the flexibility of the means employed by him in marking the surface. It states:

"The flexible outlet pipe 22 and the spring 36 are so arranged that the brush will be raised by any lumps or projections and will not gouge into a surface such as an athletic field."

In his communication to the Commissioner of Patents, asking for a reconsideration of his rejection of certain of the claims, the patentee makes no reference to the principle of "floating" now said to be the essence of his invention, but accentuates such flexibility of his means for marking and its automatic adaptability to any irregularities in the surface, calling attention to the fact that Jakob's device—the cited anticipation—held the brush rigidly against the surface, and that it could not adapt itself to irregularities on the surface, and that it was absolutely worthless, as it plowed into such surface and destroyed it for tennis court purposes.

The record presents no evidence showing that before the patenting of the defendant's device complainant made any claim that floating was the essence of his invention. In the circumstances it would seem as if the contention of complainant was an afterthought, and for the purpose of meeting the teaching of the defendant's device, which is not capable of producing any marking save by floating the material onto the ground. Rigidity in the means employed in the prior art, rather than "brushing out" of the material over or into the ground, was the point of attack in constructing the complainant's device, and overcoming the objectionable plowing or cutting into the surface by such rigid means, rather than the supposed defect arising from such brushing in, seems to have been the object sought by complainant's device. True, the capillary action of the bristles of complainant's brush admits of a floating; but such floating as takes place when they touch the ground will be accompanied with a more or less brushing effect. Complainant's claims, read in the light of his own description and subsequent argument addressed to the Commissioner of Patents to overcome the reference to Jakob, negative the suggestion that the dominant or even prominent idea of the patented device was the floating of the material, as distinguished from the "brushing out" effect. Flexibility in the marking element is the dominant

idea, and that, and not the floating operation, is the principle which must engage our attention as we determine the place complainant's patent has in relation to the prior art, and whether defendant's device is an infringement.

Mitchell being a pioneer in this art, his device would be entitled to a more generous range of equivalents than could be accorded to complainant as against defendant, for at best complainant is but an improver. Mitchell was not cited against complainant in the Patent Office. His invention clearly taught how to conduct a marking liquid from its container to the surface to be marked by the use of outlet pipe, valves, and brushes, and how to keep such brush in contact with the surface by means of a tension spring. True, his purpose was to rub the material into the ground, and his device is designedly constructed to accomplish that purpose. But one who preferred a laying on rather than a brushing in of the material would find all the instruction needed in the Mitchell device. Greater flexibility alone would be required to accomplish this. A brush, according to the texture of the bristles, is more or less flexible, and, to secure a decided rubbing effect, such flexibility would not only have to be minimized, but means provided for keeping the brush constantly in close contact with the surface. Normal flexibility not being desired by Mitchell, who preferred a rubbing into rather than a brushing over, his brush was positioned at right angles to the surface and held rigidly thereto by a tension spring. Where normal or greater flexibility is the desideration, a modifying of the Mitchell device, by changing the position from a right to an oblique angle, would be an obvious first step to an ordinarily skilled mechanic familiar with such device, and the changing of the form or quality of the brush, and whether to trail lengthwise or crosswise on the surface, would be a mere matter of mechanical adjustment.

Complainant concedes that all the elements of his claims are old, and that the claims in suit will read on the Mitchell structure. He contends, however, that the combination is new, and that his structure is so radically different in principle from the Mitchell device that it is not anticipated by the latter, notwithstanding that the general wording of his claims cover the Mitchell structure. To my mind there is no such difference between these structures as to save the anticipation. Assuming, however, that the improvement sought and attained by the complainant in his structure is a sufficient advance on Mitchell to avoid anticipation, I am satisfied that defendant's device does not infringe.

[1] Both complainant and defendant are but improvers, and the presumption arising from the allowance of defendant's patent after rejection on complainant is at least as strong in favor of noninfringement as the presumption that complainant did not infringe on Jakob. The law is well settled that where the patents sued on are not pioneer patents, and do not embody a primary invention, but are only improvements on the prior art, and defendant's machines can be differentiated, the charge of infringement cannot be main-

tained. Kokomo Fence Mach. Co. v. Kitselman, 189 U. S. 8, 23 Sup. Ct. 521, 47 L. Ed. 689. Defendant's device is substantially different in its mode of operation from complainant's. It employs a rigid vertical pipe projecting from the tank, containing a controlling valve, carrying a horizontal nozzle at its lower end, with holes in its under side. To the forward side of such nozzle a ribbed trough is hinged, which extends rearwardly and downwardly under the nozzle, so that the rear end trails on the ground. By these means the marking fluid is carried from the tank to the trough, and from there run or floated onto the surface of the ground; the ribs and the side elevations of the trough preventing the fluid from running over its sides.

[2] The defendant in his patent explains his device and its operation as follows:

"Depending from the receptacle is a rigid pipe 9 containing a controlling valve 10 and supporting at its lower end a nozzle 11. A trough 12 is hinged to the forward side of the nozzle and extends rearwardly and downwardly under the nozzle so that the rear end trails on the ground. A series of partitions 13 13 divide the trough into a plurality of channels, and the nozzle is provided with separate orifices 14 14 so located with respect to the channels that each delivers the marking fluid into a different channel. * * * In the operation of marking a tennis court the apparatus is held at about the angle illustrated, and propelled over the line to be marked with the valve open and its controlling rod latched in the gage notch which is found to give the proper flow for the desired strength of mark. In marking where the ground is not level, but is lower at one side than the other, the partitions between the channels in the trough prevent any flow on the downhill side in excess of the flow on the other side. The trough also serves as a shoe to smooth the ground ahead of the deposit, and the fluid does not touch the ground until the trough has entirely passed, so that wet, loose earth under the fresh mark will not be stirred up and the clearness of the mark impaired. When it becomes necessary to back the apparatus, as in bringing it into place to mark a second line, the valve is closed and the trough is lifted clear of the ground without removing either hand from the hand-piece."

In all the complainant's claims the brush is an element; in fact, the important element. It, as well as the connection between it and the tank, presents flexibility. Without the brush his patent would not show an operative combination. Defendant's device does not employ a brush, and there is no capillary action in the function of his marking element. In his device the marking fluid runs rearwardly upon a metal trough, having an impervious bottom with side elevations, preventing the fluid from running over the sides. This trough, pitching downward toward the rear, carries and floats the liquid onto the surface to be marked. It has flexibility, but not because of any spring, or any yielding of any of its parts when it contacts the ground, but because of its being hinged to the outlet pipe. Complainant's claims are all for a brush broadly; but he admits that, in order to obviate the brushing-in effect, a thin brush should be used.

As to claim 2 complainant's expert admits that the only novel feature "is the use of a flexible connection in combination with the brush; the brush being in certain relation to the flexible connection and the surface." This expert's contention that the "flexible

connection between the receptacle and the brush" of claim 2 is not the hollow tube 22, but the pivoted arm 32, is not borne out by the specification; but, if it were, it would be void as anticipated by Mitchell. The arm 32 is not such flexible connection, but the means provided for the support of the brush, and through which the constant pressure on the brush is transmitted from the tension spring 36. The only flexible connection described in the specification is the hollow tube 22 that leads the liquid from the receptacle to the brush. Any other interpretation of this phrase would bring the specification and claims within the denouncement of the patent statute, which commands the inventor to file a written description of his machine and the manner of constructing it in such clear and exact terms as to enable any person skilled in the art to make and use it, and to particularly point out and distinctly claim the part or combination which he claims as his invention, and render the claim void for ambiguity. Defendant's device does not employ a flexible tube or pipe as the connection between the receptacle and its marking element, and the hinged trough is not the equivalent of either complainant's brush or flexible tube connection.

Claim 4 introduces an outlet pipe and means for producing a constant pressure of the brush upon the surface as additional elements of the combination. The latter element is the spring-tensioned arm 32 supporting the brush 33, and which is pivoted to the bracket 30 attached to the lower part of the frame 11, and which tension spring 36 is fastened to the under side of frame 11 immediately to the front of the tank, and also to such supporting arm at the end opposite to the brush.

As already noted, the word "constant" was inserted into this claim to overcome the reference to Jakob, but this brings it within Mitchell. A distinction is to be made between the constant pressure, as shown by complainant's specification, and that rigid or unyielding pressure shown in Jakob's; but the pressure produced by complainant's contrivance is identical with that of Mitchell's. This is admitted by complainant's expert, who says that in view of Mitchell it was not new to produce a constant pressure of the brush upon the surface to be marked. In addition, defendant's device does not use any means to produce such a pressure as is to be termed constant within the meaning of complainant's claim.

Complainant's expert's contention that the loosely mounted rod on defendant's device pivoted to the trough, and which runs up from there along one side of the handle, is the equivalent of complainant's tension spring, is too attenuated to require more than passing notice. This rod is designed to raise the trough from the ground when desired, and nowhere in the patent is there any indication that a constant pressure was desired or achieved. True, when this rod is not actually drawn up, it will add its own weight —five ounces—to that of defendant's marking element—trough— and to that extent add to the trough's pressure upon the surface. But that is due to gravitation, which draws the mass downward, and is not an equivalent of a tensed spring designed and adjusted

to force the mass downward and to prevent the bounding upward of the marking element as it encounters an obstruction in its path.

In claim 6 the only additional element necessary to be noticed is the "hollow flexible connection between the valve and the brush." This is the hollow tube 22 referred to in considering claim 2, and what was there said is applicable here. Complainant's expert, in seeking for an equivalent in defendant's device for this element, pointed to the front portion of the trough as performing the function of the hollow flexible connection of this claim. As he admitted, however, that this was neither flexible nor hollow, further discussion of the contention concerning this claim is unnecessary, as without such attributes, because of the slight range of equivalents allowed, neither equivalency of such element nor its infringement is established.

Defendant's device infringes none of the claims in suit. Considered as a whole, the claims are not infringed, because no brush, the essential element in all of them, nor its equivalent, is used in defendant's device. Treated separately, defendant's device does not infringe claims 2 and 6, because it does not employ the element of a flexible tube or hollow flexible connection, or their equivalent; nor claim 4, because it does not use a spring tension to exert a constant pressure, or its equivalent.

The question of the validity of complainant's patent not being necessary for decision, the decree will be limited to a dismissal of the bill on the ground of noninfringement, in compliance with the rule that patents should not be declared invalid unless the case admits of no other disposition, and which, in my judgment, should control the courts of first instance.